UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CR 00732 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| LEAMON SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In June 2018, two Chicago Police Department officers discovered a concealed firearm on Leamon Smith during a routine traffic stop. R. 41, Def.'s Post-Hearing Br. at 1.[1] Smith now moves to suppress evidence of the firearm and the statements that he made during the traffic stop because (1) the officers' pat-downs were unreasonable under the Fourth Amendment; (2) Smith was arrested without probable cause; and (3) the traffic stop transformed into a custodial interrogation but the officers failed to give Smith any *Miranda* warnings. *Id.* at 2. The Court held a suppression hearing in March 2019, after which the parties filed supplemental briefing. For the reasons discussed below, Smith's motion to suppress is denied as to the firearm but granted as to some of the statements he made during the encounter.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The exhibits introduced during the suppression hearing are not on the docket, but the parties' exhibit lists are. R. 34, Def.'s Exh. List; R. 36, Gov. Exh. List.

## I. Background

On June 18, 2018, around 9:00 p.m., Smith and Dalon Naylor were driving in a blue Lexus near the intersection of Chicago Avenue and St. Lawrence Avenue in Chicago. R. 22, Mot. Suppress at 1; R. 31, Gov't's Resp. at 2. Smith was sitting in the front passenger seat. Mot. Suppress at 1. The two men were pulled over by Chicago Police Officers Steven Holden and Dimar Vasquez for running a red light. Def.'s Post-Hearing Br. at 3. Holden and Vasquez were in an unmarked tactical unit vehicle and both turned on their body cameras as soon as they initiated the traffic stop. *Id. See also* R. 40, Supp. Hearing Tr. at 7:10-20; 65:18-23. Once outside, Holden approached the passenger side of the Lexus while Vasquez walked over to the driver's side. *Id.* at 9:20-24.

At the suppression hearing, Holden testified that he "smelled the odor of fresh cannabis" as he approached the car, but that he could not tell if the smell was coming from the driver or the passenger. Supp. Hearing Tr. at 10:5-13. Holden did not mention the smell of cannabis during his interaction with Smith, nor did he make a note of it in his police report. *Id.* at 36:1-37:3. Holden also testified that Smith "appeared to be extremely nervous" and "was breathing heavy." *Id.* at 11:7-8. In the video from Holden's body camera, he tells Smith that he was "shaking like a leaf," Holden Video at 1:08-1:12, and later testified that Smith's hands were trembling when Smith handed Holden an identification card, Supp. Hearing Tr. at 11:10-15. Holden explained that this was noteworthy because traffic stops typically only implicate the driver, not the passenger. *Id.* at 11:20-12:1.

2

Holden next asked Smith to get out of the car and directed Smith towards the back of the car. Supp. Hearing Tr. at 12:16-13:1. At the suppression hearing, Holden testified that he noticed Smith was walking with a slight limp, "like a side to side" type of walk. *Id.* at 13:4-10. In the video, Holden does not immediately comment on Smith's walk or gait. Holden Video at 2:09-2:15. But he later testified that Smith's odd way of walking made Holden think that Smith was hiding something in his waistband or crotch area. Supp. Hearing Tr. at 13:13-16. Once Smith reached the back of the car, he leaned his pelvis against the trunk of the car, prompting Holden to twice ask him to take half a step away from the car. *Id.* at 14:5-8; Holden Video at 2:25.

Holden then performed a pat-down search of Smith. Supp. Hearing Tr. at 15:9-11. He focused on what he called "hot spots," including Smith's waistband, his front pockets, and his lower leg. *Id.* at 15:12-15; Holden Video at 2:30-2:45. He did not search Smith's groin area. *Id.* Holden did not find any contraband during this search. Supp. Hearing Tr. at 16:5-6. Nonetheless, he placed Smith in handcuffs and told him he was just being detained. Holden Video at 2:55-3:00. Holden then told Smith that "if it's a little loud, we can work with it," which, according to Holden, meant that if Smith was hiding some "loud"—a street term for cannabis—he should concede that now because possession of marijuana is just a ticket-type offense that could have been dealt with easily and quickly. Supp. Hearing Tr. at 17:2-7. Smith responded that he did not have any. *Id.* at 17:15-17. Holden continued to question Smith about what he was hiding, but Smith insisted that he had "really nothing." Holden Video at 3:15-

3

3:35. Eventually, Holden asked Smith, "we're going to do this the hard way bro?" *Id.* at 3:35-3:45. Holden insisted at the suppression hearing that he was not threatening Smith when he said this. Supp. Hearing Tr. at 18:2-11.

Smith then said to Holden, "it ain't on me," which Holden took as evidence that Smith was in possession of something he was trying to conceal. Holden Video at 3:47-3:53; Supp. Hearing Tr. at 18:20-24. Holden reminded Smith that "honesty goes a long way" with him and again asked Smith what he was hiding. Holden Video at 3:53-4:00. At that point, Smith began to bargain with Holden, asking if Holden was willing to "help him out" and explaining that he "could do anything to make something happen." *Id.* at 4:02-4:22. Holden understood this to be a proposition for a *quid pro quo* type of exchange, meaning if Smith handed over whatever it was that he was hiding, Smith then could help Holden in some way, like giving up a narcotic seller, to avoid a charge for whatever Smith was hiding. Supp. Hearing Tr. at 19:3-18.

Holden next walked back to his police car in order to conduct a name check in the law-enforcement database on both Smith and Naylor. Supp. Hearing Tr. at 20:4-14. He also asked Smith and Naylor to walk from the back of the Lexus to the front of the police car so the he could have a direct view of them from inside his car. *Id.* at 19:22-20:3. Holden later testified that Smith "had that side to side walk, as if he was holding something in his crotch area and he was trying to walk around it, or hold it in place." *Id.* at 21:11-13. Holden's body camera did not pick up a direct view of Smith's walk from one car to the other, but it can be seen for a second on the recording from Officer Vasquez's body camera. Vasquez Video at 4:13-4:19. Holden testified at

4

the suppression hearing that Vasquez's body-camera video showed Smith walking "almost [with] a waddle to the side, and then straight forward." Supp. Hearing Tr. at 21:22-23.

After Holden finished running his name check on Smith and Naylor, Holden approached Smith again and continued to question Smith about what he was hiding. Holden Video at 6:15-6:27. Smith was still standing at the front of the police car, where he was (once again) pressing his pelvis against the hood of the car. *Id.* at 6:19-6:25. According to Holden, this suggested that Smith was "trying to hold something in place in his crotch area." Supp. Hearing Tr. at 22:11-12. Holden next asked Smith to walk from the front of the police car back to the Lexus and again asked Smith what he was hiding. Holden Video at 6:27-6:40. Once Smith reached the Lexus, he again pressed his pelvis up against the trunk in a stance similar to the one he took against the police car. *Id.* Holden testified that he did not direct Smith into this position. Supp. Hearing Tr. at 23:6-9. Holden commented on Smith's stance—leaning his pelvis against the Lexus—which prompted Smith to take a step away from the Lexus. Holden Video at 6:35-6:42. Just a second later, though, Smith returned to the same stance, pressing his body against the back of the car. *Id.* at 6:43.

Holden then offered to uncuff one of Smith's hands so that Smith could retrieve whatever it was he was hiding. Holden Video at 6:46-6:52. Holden explained that he believed Smith was hiding either narcotics or a weapon, but that he offered to let him grab the object himself because he thought he was building a rapport with Smith. Supp. Hearing Tr. at 24:8-25. Smith responded that he did not have anything on him.

5

Holden Video at 6:52-6:54. The two men continued to engage in a back and forth until Holden eventually again said, "I don't wanna do it the hard way, or the long way." *Id.* at 7:10-7:14. Holden testified again that he did not mean this statement to be a threat. Supp. Hearing Tr. at 25:15-23. Smith also told Holden that he needed his help because other individuals were "beating up" his friends on the corner of 54th and Indiana in Chicago. Holden Video at 7:30-8:10. Holden responded that he did not believe the alleged violence was the reason Smith was acting nervous. *Id.* at 8:12-8:25; *see also* Supp. Hearing Tr. at 26:5-27:7. Throughout this exchange, Smith kept his pelvis pressed against the trunk of the Lexus. Holden Video at 6:44-8:45.

Around six-and-a-half minutes after the first pat-down, Holden conducted a second pat-down of Smith. Holden Video at 8:50-9:45. He later described his search as focusing on Smith's legs and said that he "jiggled the pants leg to almost assist [the concealed object] to fall down the leg … still going back up the leg to make sure nothing was stuck, stopping at the seam of the pants, and doing the same thing on the other leg." Supp. Hearing Tr. at 28:1-5. Holden did not touch Smith's groin area during this search and again Holden recovered nothing. *Id.* at 28:9-15. Holden then directed Smith to walk back over to the front of the police car. Holden Video at 9:45-9:52. Holden later testified that Smith hesitated before doing so, which raised Holden's suspicions because it seemed to him like Smith did not want to move. Supp. Hearing Tr. at 28:19-29:6. When Smith walked from the Lexus to the police car, Holden noticed that he walked with an "exaggerated limp… as if he was almost injured." *Id.* at 29:7-12. Indeed, Holden asked Smith if he was injured, and Smith

6

responded that he had been in a car accident and injured his right leg. *Id.* at 29:15-30:-7.

Holden then conducted a third and final pat-down. Holden Video at 10:02-10:10. He focused on Smith's right side because Smith seemed to be favoring that side and Smith had claimed to have had injured that leg. Supp. Hearing Tr. at 30:14-17. Holden described pulling Smith's pants toward him and feeling up into Smith's crotch area, where he felt a hard metal object. *Id.* at 30:18-23. After questioning Smith about the hard metal object, he eventually recovered a handgun from inside Smith's underwear. Holden Video at 10:10-11:40. Holden testified that he did not reach into Smith's underwear earlier because he "didn't have enough evidence at the time, and I couldn't violate his rights with just going in his pants, so I had to connect the dots to make sure I had enough to go by at the time." Supp. Hearing Tr. at 33:22-25. The entire traffic stop lasted around 11 minutes. *Id.* at 33:7-10. Smith has been charged with possession of a firearm by a felon under 18 U.S.C. § 922(g)(1). Mot. Suppress at 5.

## II. Standard of Review

The Fourth Amendment protects individuals against unreasonable searches and seizures. Even so, "an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore permissible, if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, 819 F.3d 951,

7

955 (7th Cir. 2016) (cleaned up).[2] Reasonable suspicion must amount to more than a hunch, but need not rise to the more-demanding standard of probable cause. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Mays*, 819 F.3d at 955 (cleaned up). But the Court's analysis of the impact of the officer's knowledge of the circumstances on his determination of a reasonable suspicion is objective and "based on common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). *See also U.S. v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) ("What matters is whether a reasonable police officer, faced with the circumstances confronting [the arresting officer], would believe that Patton posed a danger to those in the immediate vicinity.").

### III. Analysis

Smith offers several arguments in support of suppressing the evidence uncovered during the traffic stop: (1) Holden's first pat-down was unconstitutional; (2) the additional pat-downs were not justified; (3) Holden effectively placed Smith under arrest without probable cause; (4) Holden subjected Smith to an unlawful

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

8

custodial interrogation; and (5) Smith was searched as a result of an illegal arrest. *See* Mot. Suppress; Post-hearing Brief.

Before turning to the merits of these arguments, the Court must first address the government's contention that Smith forfeited some of these arguments because he made them for the first time in his post-hearing brief, rather than in his initial motion to suppress. R. 42, Gov't's Post-Hearing Resp. at 3-4. Smith's arguments are not forfeited. He timely filed a motion to suppress and the Court encouraged his attorney to more clearly frame his arguments in his post-hearing briefing. Supp. Hearing Tr. at 79:2-7. Although good cause is typically required to file a motion to suppress after the Rule 12 and Rule 16 motions deadline has passed, that is not required here because Smith did timely file a motion to suppress and there is nothing prejudicial about considering his post-trial briefing. Indeed, the Court would have simply extended the pre-trial motions deadline and allowed Smith to file an amended motion if he had asked for that. The government argues that it is prejudiced because it did not have a chance to elicit testimony about Holden's use of handcuffs. Gov't's Post-Hearing Resp. at 4. But Holden did testify about his rationale for handcuffing Smith. Supp. Hearing Tr. at 16:7-12, 24:5-10, 40:16-41:18. The handcuffing was also clearly visible on the recording from his body camera. Holden Video at 2:55-3:00. So, in the interests of justice, the Court will consider all of Smith's arguments on the merits.

## A. Initial Pat-Down

Smith first objects to Holden's initial pat-down, arguing that Holden "did not have a reasonable, articulable suspicion that Mr. Smith was armed and dangerous, and therefore the initial pat-down was unconstitutional." Def.'s Post-Hearing Br. at 12. To begin, the initial seizure of the Lexus by Holden and Vasquez was a valid traffic stop. *Brendlin v. California*, 551 U.S. 249, 257-58 (2007). Although Smith did not concede this point, he admitted that both Holden and Vasquez testified that the Lexus ran a red light. Def.'s Post-Hearing Br. at 11-12. And he presented no evidence undermining this testimony or calling the fact into question. So the Court credits the officers' testimony on this fact. The traffic stop was valid.

"During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). If an officer has a reasonable suspicion that the driver or passenger may be armed and dangerous, then the officer may also frisk that individual. *Id.* To determine if a suspicion was reasonable, the question "is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Before turning to the facts known to Holden at the time of the initial pat-down, it is worth addressing the government's argument that Holden's subjective thoughts are not at all relevant to the analysis. *See* Gov't's Post-Hearing Resp. at 7-9. To be sure, the government is correct that the *Terry* standard is an objective one, *id.* at 7,

but only as it applies to the ultimate question of whether what is known to the officer amounts to reasonable suspicion. Before getting to that final step, the Court must first determine the facts known to Holden at the time of the pat-down. So the question of what Holden saw, heard, smelled, and said is relevant to determining the set of facts on which to apply the reasonable-suspicion analysis. Consider, for example, if Holden had been distracted for a moment during the traffic stop and did not notice that Smith made aggressive movements. Even if those movements were caught by Smith's body camera, still that fact could play no direct role in assessing reasonable suspicion. Put another way, the Court cannot sweep facts into its analysis not known to the arresting officer. *Tinnie*, 629 F.3d at 753 ("The question is rather whether given all of the facts known to [the officer]. a reasonable officer would have believed the frisk was justified.").

Having said that, in this case, several facts were known to Holden that created a reasonable suspicion that Smith was armed and dangerous. First, the traffic stop occurred at night after it was dark, which a prudent officer would take into account when assessing how much suspicion is needed for a frisk. *See Patton* 705 F.3d at 738; *Tinnie*, 629 F.3d at 752. The more hampered an officer's visibility is of the scene and the suspect, the more danger the suspect poses compared to a bright-daylight traffic stop. Second, Holden testified that he smelled cannabis when he approached the car, which the Court credits. *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999). It is true that Holden failed to mention the smell of cannabis during the stop itself or in the police report. But Officer Vasquez actually recovered cannabis on Naylor (the

11

driver), which tends to corroborate Holden's account. Supp. Hearing Tr. at 59:11-19; 74:16- 75:1. And Holden testified credibly, live and in-person, to this fact during the suppression hearing. *Id.* at 10:5-13. Third, the Court credits Holden's testimony that Smith appeared visibly nervous during his interaction with Holden. *See Patton*, 705 F.3d at 740 ("A display of nervousness is frequently recognized as a sign that a suspect has something to hide, including a weapon."); *Tinnie*, 629 F.3d at 752. Indeed, during the stop and memorialized on the video, Holden contemporaneously and repeatedly told Smith that he was "shaking like a leaf" and commented on how much Smith was sweating. *Id.* at 11:10-23, 16:17-22, 27:2-7. Finally, when Smith got out of the Lexus, he almost immediately pressed his pelvis up against the trunk, prompting Holden to ask him to take a step away from the car. *Id.* at 14:5-8; Holden Video at 2:25. Holden testified that, based on his experience, positioning one's pelvis against a car, as Smith did, suggests that the person is trying to hide something in the crotch area. *Id.* at 22:11-12. It was, therefore, reasonable for Holden to infer that Smith was hiding something. *See United States v. Vaccaro*, 915 F.3d 431, 436 (7th Cir. 2019) ("Vaccaro appeared to be having difficulty with something that the officer could not see, so the officers had reasonable suspicion to order him out of the car and to perform a pat-down search.") (cleaned up); *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (finding that defendant's movement—pressing the front of his body against the minivan—made suspicion that defendant was armed and dangerous more reasonable). Taken together, these facts are enough for a reasonable officer in

12

Holden's position to have a reasonable suspicion that Smith was armed and dangerous. So the initial pat-down was justified.

### B. Subsequent Pat-Downs

Holden conducted a total of three pat-downs of Smith during the course of the stop. In his post-hearing opening brief, Smith did not explicitly challenge the second and third as unreasonable. Smith argued in his reply brief, however, that he does not concede these subsequent pat-downs were valid because they were actually "unlawful searches, not supported by probable cause." Def.'s Post-Hearing Reply at 4. The Court disagrees. As discussed below, the traffic stop did not automatically turn into an arrest (which would require probable cause) when Holden handcuffed Smith. *See Howell v. Smith*, 853 F.3d 892, 898 (7th Cir. 2017) ("We also have recognized a limited set of circumstances in which handcuffs are appropriate without converting a *Terry* stop into a full arrest. Chief among them is officer safety and the possibility of the presence of a weapon.").

Indeed, Smith's behavior following the initial pat-down elevated the reasonable suspicion that he was armed and dangerous, making the second and third pat-downs proper under *Terry*. Following the initial pat-down, Smith time and again positioned himself so that his pelvis was pressed up against either the Lexus or the police car. He also walked back and forth between the two vehicles in a lumbering, side-to-side way. Holden inferred from this "waddle" that Smith was likely hiding something in his pants. These facts, combined with Smith's continued nervous shaking and sweating, created a scenario where a reasonable officer would suspect

13

Smith was armed and dangerous. Nor does it undermine reasonable suspicion that nothing was found during the first frisk. It is reasonable to perform more than one search if an officer has a "credible reason to believe that [he] might have missed a dangerous weapon" the first time. *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013). A one-frisk-only rule would create a privacy-adverse Fourth Amendment incentive: an officer would lean toward performing the most intrusive frisk possible the first time around, knowing that no more would be allowed. (Here, that would have taken the form of Holden reaching into Smith's underwear at the first pat-down.) All in all, Smith's nervousness, suspicious gait, and repeated attempt to lean right-up against the cards gave Holden a credible reason to try additional frisks. The second and third frisks were reasonable.[3]

**C. Detainment**

Smith next argues that when Holden handcuffed him, he was no longer merely detained, but rather was now fully arrested without probable cause. Def.'s Post-Hearing Memo at 16-18. The government responds that the police may detain passengers during a traffic stop without "transforming the encounter into an arrest requiring probable cause." Gov't's Post-Hearing Resp. at 9 (citing *Brendlin v. California*, 551 U.S. 249 (2007)). That is true, but often it is not: it all depends on the circumstances. "Handcuffing a suspect during a pat-down search for weapons should

---

[3]The Court does not rely on any statements made by Smith to justify any of the pat-downs, because, as explained further below, Smith was not properly provided *Miranda* warnings even though he was subject to a custodial interrogation.

be the rare case." *Vaccaro*, 915 F.3d at 436. The Seventh Circuit has explained that a rare case includes instances in which there is a concern for officer safety. *Id.*

There was such a concern here. Before Holden handcuffed Smith, he smelled marijuana, observed Smith's nervousness, and commented on his body position—pressing his pelvis against the trunk of the Lexus—twice asking Smith to take a step away from the car. The encounter also took place at night. Knowing all this, it was reasonable for Holden to be concerned about his safety and the safety of his fellow officer. This would, of course, be a much closer call if Holden had immediately handcuffed Smith, then performed the pat-down, all before observing that Smith appeared nervous and was pressing his pelvis against the trunk of the car. But that is not what happened. Because Holden was reasonably justified in his concern for officer safety, his use of handcuffs on Smith did not transform this encounter into an arrest. That said, as explained next, at some point the encounter did amount to a custodial interrogation for *Miranda* purposes under the distinct protection of the Fifth Amendment.

### D. Custodial Interrogation

Smith's final argument is that his encounter with Holden became a custodial interrogation after he was handcuffed, and, as a result, Holden was required, but failed, to give him the required warnings under *Miranda*. Def.'s Post-Hearing Br. at 19-20. The government counters that *Miranda* warnings are unnecessary during a valid *Terry* stop. Govt't Post-Hearing Resp. at 12-14. The government is correct in part: there was no need to immediately recite the warnings to Smith when Holden

asked him to step out of the car. Nor was there a need to recite them before or immediately after the pat-down, even though Smith was in handcuffs, as explained earlier. But 3½-minutes into the encounter, Holden asked Smith, "we're going to do this the hard way bro?" Holden Video at 3:35-3:45. Smith had been in handcuffs for almost a minute at this point. Although Holden testified that he was not subjectively threatening Smith when he said this, a reasonable person in Smith's position would believe that Holden was going to continue the detention of Smith, possibly until he found what he suspected Smith to be hiding. A reasonable person in these circumstances would not have felt free to terminate the interrogation or to leave. So, at this point, the encounter became a custodial interrogation for *Miranda* purposes. *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

As a result, Holden was required to deliver *Miranda* warnings to Smith at the 3½-minute mark. Because he failed to do so, any statement Smith made following Holden's first reference to doing things the "hard way," Holden Video at 3:35, must be suppressed. The Court emphasized that it did *not* rely on any of these statements in assessing the reasonableness of Holden's pat-downs under *Terry*. The two analyses pose different questions. Smith was in custody (at the 3½-minute mark) and not given warnings under *Miranda*, so his Fifth Amendment right against self-incrimination was violated. *J.D.B.*, 564 U.S. at 269. But Smith's Fourth Amendment right against unjustified search and seizure was not violated, because there was a reasonable suspicion that he was armed and dangerous based on the facts outside of his statements—the smell of marijuana, his nervous trembling and sweating, the way he

16

positioned his body against the cars, his pronounced side-to-side walk and limp, and the time of night during which the encounter took place. This is true even of the pat-downs that took place after the encounter became a custodial interrogation

## IV. Conclusion

For the reasons discussed, the government has proven that the pat-downs performed by Officer Holden on Smith were valid under *Terry*. The motion to suppress is denied as to the firearm discovered during the third pat-down and any of Smith's statements made before the 3½-minute mark. Smith, however, has shown that he was in custody once Holden placed him in handcuffs and asked him if they were going to do things the "hard way." So Smith's statements made after that point in the encounter must be suppressed. The government and Smith shall confer on the next step of the case and shall file a joint status report by September 16, 2019. The status hearing of September 19, 2019 remains in place.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 6, 2019